## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-690 (RCL)** |
| **Phillip Sean Grillo** | |
| **Defendant.** | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Grillo was convicted following a jury trial of

- obstruction of a Congressional proceeding, in violation of 18 U.S.C. § 1512(c) (Count One);

- entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two);

- disorderly or disruptive conduct with intent to impede Government business or official functions, in violation of 18 U.S.C. § 1752(a)(2) (Count Three);

- disorderly or disruptive conduct in the Capitol building or on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and

- parading in the Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).

Following the Supreme Court's decision in *Fischer v. United States*, 603 U.S.__, 144 S. Ct. 2176 (2024), Grillo filed a motion for judgment of acquittal on all Counts in the indictment. ECF 130. In response, the government requested the Court deny Grillo's motion for Counts Two, Three, Four, and Five of the indictment and leave of Court for additional time to assess *Fischer's* implications on Count 1 of the indictment. ECF 132. On August 19, 2024, the government

1

informed Grillo and the Court that it would not oppose Grillo's motion for judgment of acquittal on Count One.

Assuming the Court grants Grillo's request for judgment of acquittal on Court One and denies his request on the remaining counts, Grillo now faces sentencing for the four remaining convictions.

For the reasons set forth herein, the government requests that this Court sentence defendant Phillip Sean Grillo to two consecutive twelve month custodial sentences for Counts Two and Three, for a total of twenty-four months of incarceration, two years of supervised release, $500 in restitution, and a mandatory $70 special assessment (consisting of the mandatory assessments of $25 for each Class A misdemeanor conviction (Counts Two and Three) and $10 for each Class B misdemeanor conviction (Counts Four and Five). The government's request for a total twenty-four-month prison sentence exceeds the Sentencing Guidelines range, but as explained herein, a twenty-four-month prison sentence appropriately reflects Grillo's conduct on January 6, 2021, and balances the factors articulated in 18 U.S.C. § 3553.

## I.   INTRODUCTION

Grillo participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

2

After attending the former president's rally on January 6, 2021, Grillo walked to the United States Capitol. After joining the mob on the West Plaza, Grillo traveled to the Upper West Terrace where Grillo yelled "*Charge!*" through a megaphone as he entered the Capitol through a broken window adjacent to the Senate Wing Door. Once inside, Grillo walked through the Capitol Crypt to the Rotunda, while making inflammatory comments around other rioters, such as "*We stormed the Capitol… We want justice!*"

Eventually Grillo entered the East Foyer, where he and several other rioters successfully bypassed officers and pushed open the East Rotunda Doors, facilitating a flood of rioters from the East Front into the Capitol. For the next 50 minutes, Grillo lingered among the mob in this location, entering and exiting the Capitol through the Rotunda Doors several times as officers struggled to remove rioters from the Capitol and secure this location. After exiting the Capitol, Grillo triumphantly proclaimed on the East Steps, "*We're not going to fucking take it anymore!*" and "*We stormed that shit!*"

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the court to the Affidavit accompanying the complaint filed in this case, ECF No. 1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.      Grillo's Role in the January 6, 2021, Attack on the Capitol**

Grillo lives in Queens, New York, where he maintained an active role in local Republican politics, holding an elected position as the 24th Assembly Republican District Leader. More recently, in May 2023, Grillo declared his candidacy for the U.S. House of Representatives.

As part of his political activities, Grillo maintained an active social media presence through "X" (formerly "Twitter"), where he routinely posted political content, including material concerning the former president and alleged improprieties with the 2020 presidential election to his thousands of followers. (Trial Ex. 426, 428 – 431, 433 – 435).[2]



*Image 1 & 2: Trial Ex. 433 and 435 depicted Grillo's use of "X" to spread misinformation following the 2020 presidential election.*

Following the November 2020 presidential election and during the weeks before January

---

[2] The government does not seek to penalize Grillo for his views, but for his conduct and intent. *See United States v. Kenneth Bonawitz,* (23-cr-55-JMC), ("There's this view that people who were arrested on January 6th are like political prisoners being imprisoned for their political beliefs. I just think that's so dangerous. I want you to understand, I don't care anything about your political beliefs at all. You're entitled to have whatever beliefs you want. It's the actions that are landing people in court and that you're facing sentencing for. [] And so I always make a point to say that I don't care what anyone's political beliefs are. It's the actions and the assaultive actions here that are most concerning to the Court.") Sent'g Tr. at 37.

6, 2021, Grillo posted and reposted widely debunked theories concerning voter fraud in the 2020

presidential election. This culminated in a repost on January 5th, 2021, the day before the Capitol

riot, where Grillo shared the following false claim from the former president (Trial Ex. 426):



*Image 3: One of several "Tweets" contained in Trial Ex. 426 concerning the Vice Presidents'
role in certifying the 2020 presidential election.*

On the evening of January 5th, 2021, Grillo drove himself and several associates from

Queens to Washington, D.C. to attend the former President's "Stop the Steal" rally on January 6,

2021. The group arrived at their hotel in downtown Washington D.C. in the early morning hours

of January 6, 2021. Instead of sleeping in the hotel, Grillo and one associate spent the evening in

a stationary vehicle in the parking lot, consuming copious amounts of alcohol through the

following morning.

The next morning, Grillo walked with a group to the Ellipse to attend the "Stop the Steal"

rally. The below image (Trial Ex. 402.1) captured Grillo, second from the right, prior to attending

the former president's rally on January 6, 2021.



*Image 4: Trial Exhibit 402.1 showed Grillo with several other individuals whom he traveled with from New York to Washington D.C.*

While walking to the Ellipse, a member of Grillo's group recorded a video that captured Grillo stating he was, *"Over here in D.C., hopefully not wasting gas,"* indicating a purpose behind his trip to Washington, D.C. (Trial Ex. 401). Additionally, as Grillo walked to the Ellipse, one of Grillo's associates appeared in a video discussing plans to "*attend the speech at the Ellipse, march down to the Capitol, demand Vice President Pence decertify the election, and then start the revolution.*" Grillo appeared in this video and was in the immediate vicinity of this individual at the time these comments were made. (Trial Ex. 401.1).

After attending the former president's speech at the Ellipse, Grillo marched down Pennsylvania Avenue, past barricades, to the Capitol. At one point, open-source footage captured Grillo on Pennsylvania Ave., among other rioters, yelling into a megaphone, "*We're going to the Capitol Building!*" (Trial Ex. 403).



*Image 5: A Screenshot from Trial Exhibit 403 captured Grillo, circled in yellow, on Pennsylvania Ave yelling through a megaphone as he walked to the Capitol.*

Once at the Capitol, Grillo traveled to the front of the mob where police formed a line on the Lower West Front to impede the mob's advance on the Capitol grounds. Here, Grillo witnessed other rioters aggressively confronting police officers. He remained on the Lower West Front among the mob for some time before advancing further on the Capitol. In one instance during this time, Grillo witnessed a rioter experience a heart attack near the Lower West Front. (Trial Ex. 408). At another time, he heard a loud explosion.

Despite the chaotic scene unfolding around him, Grillo joined a mob that climbed stairs adjacent to the inauguration stage to reach the Upper West Terrace at around 2:10 p.m. On the Upper West Terrace, Grillo repeatedly yelled "*Charge!*" through his megaphone to other rioters. (Trial Ex. 410). Grillo repeated his call to "*Charge!*" as he entered the Capitol by climbing through a broken window adjacent to the Senate Wing Door at 2:23 p.m. Video evidence admitted at trial contradicted Grillo's trial testimony (and his corresponding statement during a prior FBI

interview) that other rioters "dragged" and "pushed" him through a window and into the Capitol interior. (Trial Ex. 411).



*Image 6 & 7: Screenshots from Trial Ex. 410 & 411 of Grillo encouraging rioters and climbing through a window to enter the Capitol.*

Once inside the Capitol, Grillo joined a large group of rioters in the Crypt. As the mob overwhelmed a makeshift police line there, video footage captured Grillo chanting with the crowd and claiming that he had "*Stormed the Capitol.*" (Trial Ex. 412). Grillo moved with the mob up the stairs to the Capitol Rotunda. Before entering the Rotunda, an individual representing himself as a member of the media stopped Grillo and asked, "*Why are you here?*" Grillo responded that he was, "S*torming the Capitol…we want justice…we want equal fair vote[sic]… we want a fair vote…I'm here to stop the steal… it's our goddamn house.*" (Trial Ex. 424).



*Image 8: A screenshot from Trial Ex. 424 where Grillo is yelling into a megaphone before entering the Capitol Rotunda.*

After entering the Rotunda, Grillo joined a mob of rioters attempting to push past police officers into the East Foyer. Ignoring the officers' verbal commands, Grillo was one of the initial rioters to move past officers there at 2:36 p.m. (Trial Ex. 309). Several officers stood with their backs against the inside of the door to prevent the mob from opening it and letting other rioters inside.

Outside the door, a large, violent mob attempted to gain entry to the Capitol. Video footage admitted at trial showed rioters on the outside of the Rotunda Doors physically assaulting officers, stealing their riot shields, and spraying officers with chemical irritants during this time. Some rioters chanted, "We want Trump!" and "Who's your president? Trump!" (Trial Ex. 422). Inside the Capitol building, Grillo moved to the front of the mob, standing directly in front of the officers who were guarding the Rotunda Doors. Grillo and other rioters pushed past the police, opening the Rotunda Doors, paving the way for the mob of rioters outside to enter the East Foyer at 2:38 p.m. (Trial Ex. 418 & 310). Video footage admitted at trial showed many of these rioters remained

in the East Foyer where they physically confronted police officers and impeded the officers' efforts

to re-establish control over the Rotunda Doors. (Trial Ex. 311 – 311.4).



*Image 9: In this screenshot from Trial Exhibit 309, Grillo was one of the initial rioters to bypass police and enter the East Foyer at this time.*



*Image 10: A screenshot from Trial Ex. 418 captured Grillo at the front of the mob in the East Foyer seconds before Grillo and other rioters pushed open the Rotunda Doors.*

For the next 50 minutes, Grillo ignored police efforts to control the doors and moved in

and out of the Capitol with the mob several more times. Throughout this time, video footage admitted into evidence showed Grillo elated and gleeful. He routinely recorded his actions on his mobile telephone while raising his arms in an act of defiance as he and other rioters obstructed the efforts of officers around him. In one instance after Grillo departed the Capitol through the Rotunda Doors, he yelled, *"We're going back in!"* and *"Forward!"* urging his fellow rioters to reenter the Capitol through the Rotunda Doors. (Trial Ex. 918). In this same video, Grillo joined other rioters and smoked marijuana in the East Foyer. Finally, after over an hour with the mob inside and immediately outside the Capitol, U.S. Capitol Police officers forced Grillo to exit from the Capitol interior at 3:30 p.m. (Trial Ex. 311.4). In total, Grillo entered the Capitol on four separate occasions.



*Image 10: Trial Ex. 918 showed Grillo smoking marijuana inside the Capitol.*

Standing among the mob on the East Front Steps, directly outside the doors, Grillo made videos of himself, proclaiming his satisfaction with his actions, the actions of the mob, and the

general events on January 6, 2021. Videos from Grillo's cell phone admitted at trial showed Grillo

on the East Steps passionately proclaiming, "*We're not going to fucking take it anymore!*" and

"*We stormed that shit!*" (Trial Ex. 916 & 917). Grillo also made clear that he and the other rioters

acted with a purpose, exclaiming, "*We fucking did it, we entered the Capitol building, we fucking*

*did it, we fucking did it baby, you understand? We stormed the Capitol! We shut it down!*" (Trial

Ex. 915).



*Image 11: Grillo, in Trial Ex. 917, on the East Steps gloating about his actions at the*
*Capitol after his departure from the Capitol interior.*

Soon thereafter, Grillo departed the Capitol grounds and walked back to his hotel. There

he rejoined his associates and drove back to Queens.

### III.    THE CHARGES AND TRIAL

On November 19, 2021, a federal grand jury returned an indictment charging Grillo with five counts, including, 18 U.S.C. §§ 1512(c)(2), 1754(a)(1), 1754(a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G).

A jury trial commenced on November 27, 2023. At trial, Grillo testified and acknowledged that he had "trespassed" at the Capitol on January 6, 2021. But he also testified falsely on a number of points. For instance, despite the presence of barricades, police lines, violence in his immediate vicinity, and entering the Capitol through a shattered window, he claimed he did not know at the time that he was not permitted to enter the Capitol. Grillo also disputed his intent to corruptly obstruct the Joint Session of Congress. According to Grillo, he did not hear the former president's speech at the Ellipse and did not know why he left the rally for the Capitol, notwithstanding that he had recorded a video of himself on his phone at the rally. Grillo blamed his conduct on his intoxication and a prior bi-polar diagnosis, which he claimed resulted in an elated and manic state.[3] Grillo made numerous other contradictory and unsubstantiated claims to absolve his intent, including testimony that his purpose for entering the Capitol was to take a picture with the former president.

Grillo also maintained he had no knowledge of the certification process and stated he was unaware Congress met in the Capitol building. He made these claims despite his experience with local and national politics, as well as Twitter posts that made clear he knew that Vice President Pence was at the Capitol to certify the election results. As discussed above, Grillo offered a false narrative for his initial entrance through a window by the Senate Wing Door.

---

[3] Probation requested Grillo provide additional information pertaining to treatment and medications for his mental and emotional health. Grillo did not offer the requested information as of the date of the PSR's filing. *See PSR* ¶ 73.

Video evidence showed Grillo volitionally entered the Capitol interior and was not "dragged" or "pushed" through a window as he represented. (Trial Ex. 411). On the stand, Grillo further asserted the government infringed on his First Amendment rights by making evidentiary objections during his direct examination. These theatrics led to an admonishment by this Court outside the presence of the jury.

On cross-examination, the government attacked Grillo's often cavalier view of the events of January 6, 2021.[4] The government confronted Grillo with the admitted trial exhibits and his previous FBI interview, highlighting the unreasonableness of his claims and evincing Grillo's demonstrably false and misleading statements on direct examination.

On December 5, 2023, a jury convicted Grillo on all counts.

## IV.    STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, Grillo faces the following penalties:

- Count Two (Entering and Remaining on a Restricted Building of Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Three (Disorderly and Disruptive Conduct in a Restricted Building or Grounds): up to one year imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25.

- Count Four (Disorderly Conduct in a Capitol Building): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

- Count Five (Parading, Demonstrating, or Picketing in a Capitol Building): up to six months imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

---

[4] At trial, Grillo failed to appreciate the severity and consequences of his actions. He likened the scene at the Rotunda Doors and East Foyer to a concert atmosphere and attempted to excuse his actions by comparing it to a "mosh pit" where he became subsumed with the crowd around him.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

Following *Fischer* and the government's notice regarding Count One, the guidelines calculation in the draft PSR (ECF 117) is no longer accurate. Thus, the government urges the Court to apply the Guidelines analysis for Counts Two through Four laid out below. In that regard, the government continues to object to the PSR's application of U.S.S.G. § 4C1.1, *See* PSR ¶ 49, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case. While the government concedes Grillo did not directly assault or engage in direct violence with police, Grillo's actions constituted a credible threat of violence to the officers in the East Foyer near the Rotunda Doors. Grillo was one of the initial rioters to bypass police in the East Foyer and gain access to the inside of the Rotunda Doors. Here, he and other rioters pushed past officers guarding the Rotunda Doors from the inside and opened the Rotunda Doors to the mob outside. A reasonable officer in the position of the officers at the Rotunda Doors would view Grillo's actions as a credible threat of violence in that context. Judge McFadden, examining nearly identical behavior at the Rotunda Doors in *United States v. Alexander Secor* (21-cr-157-TNM), declined to apply § 4C1.1.[5]

---

[5] *See United States v. Alexander Secor* (21-cr-157-TNM, ECF 63), "An individual makes a credible threat of violence under §4C1.1(a)(1) when he 'believabl[y] express[es] an intention to use physical force to inflict harm.' *United States v. Bauer*, ---F. Supp. 3d ---, 2024 WL 324234, at *2 (D.D.C. 2024). The Government argues that Secor's conduct in helping breach the East Rotunda Doors constituted a credible threat of violence. The Court agrees." [] "A reasonable

Grillo's efforts also enabled and encouraged ongoing violence outside the Capitol as rioters simultaneously assaulted officers directly adjacent to the exterior of the Rotunda Doors, while also facilitating a flood of rioters into the Capitol once Grillo successfully breached the Rotunda Doors. In short, Grillo's efforts enabled additional violence against officers by aiding and abetting the entrance of violent rioters into the Capitol. Many of these rioters posed a significant threat of violence as they continued to engage, and threatened to engage, in physical assaults against officers in the Capitol's East Foyer.

Due to the unique and substantial institutional harms caused by the January 6 riot and the significant need to deter future political violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[6]

---

officer in the position of the three Secor confronted would have perceived his conduct to be a credible threat of violence. Consider what those officers encountered. Three officers were confronted by a crowd of 25 rioters – eight time their number. Those rioters backed the officers against a closed door, denying them any readily available accessible retreat. They then advanced toward the officers, pushing against them and forcing their backs further to the door. An officer in this situation would reasonably conclude that the members of the crowd intended to harm him."

[6] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The

The government calculates Grillo's guidelines range as follows:

Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Special Offense Characteristic | +2 |
| U.S.S.G. § 3C1.1 | Adjustment | +2 |
| | **Total** | **8** |

Count Three: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 3C1.1 | Adjustment | +2 |
| | **Total** | **12** |

Count Four & Five:

The Sentencing Guidelines do not apply to Class B misdemeanors. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9

Grouping Analysis

Counts Two and Three comprise a single group under U.S.S.G. §3D1.2(a) and (b) because the victim of each count is Congress.

**Total Adjusted Offense Level:                                               12**

The U.S. Probation Office calculated Grillo's criminal history as category I, which is not disputed. *See* PSR ¶ 53. Accordingly, based on the government's calculation of Grillo's total adjusted offense level at 12, Grillo's Guidelines range is 10 to 16 months of imprisonment.

**A.  Upward Departure & Variance**

After determining Grillo's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Grillo's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our

---

government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

Grillo was an avid and willing participant in an unprecedented crime. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Grillo "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in Grillo's Guidelines calculation reflects these facts. Grillo would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[7] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And  simply  saying,  yeah,  I  know  I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*,

---

[7] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

21-CR-116-DLF, Sent. Tr. at 85. So a sentence within Grillo's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G.  § 5K2.0(a)(2). The Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[8] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to

---

[8]  This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence."  *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

- "He just wanted to delay the certification. He wanted the election certification stopped. That's chilling to me. I mean, that is not a minor thing, in that through -- through acts of violence and intimidation, we're going to stop the most sacred day in our democracy from occurring, which is the certification of the election, because we want some more time to try and make our case because the dozens and dozens of courts that have considered the issue and have concluded there was not a problem with the election weren't enough, and because I want someone else to take another look at this. And so, therefore, I'm going to go down to the Capitol and I'm going to stop the certification of the election from occurring. So I think that the offense here, to my mind, is one of enormous gravity." *United States v. Wyatt*, 23-CR-215-RDM, Sent. Tr. at 44.

- "But what a dangerous precedent the attack on January 6 set. What a Pandora's Box it opened. We still don't [know] how corrosive it will prove to be to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power. *United States v. Sparks*, 21-CR-87-TJK, Sent. Tr. at 94.

Indeed, even before *Fischer*, judges of this Court gave significant upward departures and/or variances when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

And several judges of this Court have upwardly departed in January 6 cases precisely because in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23

at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

Recently, in *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posted a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sentencing Tr., at 87-88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was

warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment, approximately 150% above the high end of the advisory guideline range.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id.* at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id.* After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment, approximately 56% above the high end of the advisory guideline range.

Because the seriousness of Grillo's crime is not adequately captured by the applicable Guideline, an upward departure is appropriate here as well. If the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, this Court has acknowledged that "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January

6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

In past sentencings, this Court has made clear its view that January 6 was, "[]not normal. This cannot become normal. We as a community, we as a society, we as a country cannot condone the normalization of the January 6 Capitol riot." *See United States v. Johnatakis,* 21-CR-91-RCL, Notes for Sentencing, April 3, 2024. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of

law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[9]

And the risk of another attack on the Capitol remains. "The heated and inflammatory rhetoric that brought the defendant to the District has not subsided. The lie that the election was stolen and illegitimate is still being perpetrated." *United States v. Cleveland*, 21-CR-159-ABJ, Sent. Tr. at 94-95. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

Other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt,* 21-CR-87-DLF, Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-368-TJK, Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters

---

[9]  Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

require additional punishment beyond what my [guideline] calculation allows.").[10]

In this case, the government submits that an upward variance and/or departure to 24 months is warranted to reach an appropriate sentence. As discussed below, similarly situated defendants have received sentences exceeding 24 months for similar conduct.[11]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration utilizing consecutive sentences.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Grillo's conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. With a megaphone in his hand, Grillo climbed through a broken window

---

[10] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

[11] Pursuant to U.S.S.G. § 5G1.2(d), where the sentence to be imposed exceeds the statutory maximum of any one count, then the remainder of the sentence shall run consecutively, to the extent needed to produce a combined sentence equal to the total punishment.

into the Capitol yelling "*Charge!*" He proceeded to impede officers' ability to control the crowd and facilitated a flow of rioters into the Capitol through the Rotunda Doors. Throughout his time in the Capitol, and after he finally departed, Grillo made provocative comments evincing the purpose behind his actions. The nature and circumstances of Grillo's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 24 months of incarceration.

### B.  Grillo's History and Characteristics

Grillo resides in Queen, New York and his lived there most of his life. Grillo does not have any prior convictions. PSR ¶ 52.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Grillo's criminal conduct on January 6 – particularly at the Rotunda Doors – was the epitome of disrespect for the law.[12]  The attack on the Capitol on January 6, 2021, struck at a core American principle *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.")

---

[12]  As indicated *supra*, comparing the scene at the Rotunda Doors to a concert like atmosphere and excusing his actions by comparing it to a "mosh pit" shows that Grillo failed to appreciate the severity and consequences of the riot. These representations are probative of Grillo's character and disregard for the seriousness of his actions, necessitating a punishment to deter him from committing future crimes.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is necessary "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Grillo failed to express remorse or acknowledge the seriousness of his conduct on social media leading up to January 6, 2021, or his actions on January 6, 2021. Grillo's trial testimony, discussed above, is noteworthy in this respect. Grillo's efforts at trial to distance himself from the former president and the wide-ranging claims of election interference belied his actual intent on January 6, 2021, where he propagated misinformation concerning the 2020 election on social media to his thousands of followers. Only at trial, several years after the events of January 6, 2021, did Grillo try to explain away his crimes through self-serving testimony concerning his intent and reasoning for going to the Capitol on January 6, 2021. Yet, Grillo's other testimony at trial revealed his true intent on January 6, 2021, which continues through the present day. He complained on the stand that the government's objections at trial restricted his first amendment rights; he offered evasive and illogical explanations for his conduct; and, on specific instances, the government directly confronted Grillo

---

[13] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

with prior contradictory statements he gave to FBI agents. All of this revealed a lack of contrition for his actions and his sentencing must sufficiently deter participation in any future, violent riots.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. But as explained above, the Guidelines range here is insufficient to satisfy all of the sentencing factors in 18 U.S.C. § 3553(a), particularly the nature and severity of the offense and the need for general deterrence, warranting an upward departure or variance.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[14]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.[15]

First, in *United States v. Anthony Williams*, 21-cr-377 (BAH), the defendant used social media to express his anger with the 2020 election results and, like *Grillo*, recorded himself outside the Capitol lauding his actions when he stated, "We stormed the stairs of the Capitol, pushed the cops back and were maced and pepper sprayed and hit everybody, we took this fucking building." Williams and Grillo also took similar paths through the Capitol. Williams entered the Capitol near the Senate Wing Doors, overrunning officers in the Capitol Crypt and finding his way to the Rotunda where he actively resisted and mocked police. Williams also, like *Grillo*, smoked

---

[14] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[15] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

marijuana inside the Capitol. Following January 6, 2021, Williams bragged about his actions and expressed no remorse and proclaimed January 6 was the proudest day of his life. Following his conviction for violations of 18 U.S.C. §§ 1512(c)(2), 1754(a)(1), 1754(a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G), Judge Howell sentenced Williams to 60 months of incarceration. Understanding Grillo no longer faces sentencing for violating 18 U.S.C. §§ 1512(c)(2), *Williams* nonetheless offers factual comparators the Court can consider under an 18 U.S.C. 3553(a) analyses.

Similarly, additional cases offer sentencing comparisons by rioters convicted of offenses for entering the East Foyer and Rotunda *following* Grillo's efforts to push open the Rotunda Doors. In *United States v. Pauline Bauer*, 21-cr-386 (TNM), the defendant joined the riot from the east plaza and forced herself into the building through the Rotunda Doors around 2:43 p.m. as officers attempted to stop the crowd from flowing through the Rotunda Doors. Once inside, Bauer accosted officers who were trying to secure the Rotunda. Bauer also made incendiary comments to kill Speaker Nancy Pelosi near her office. Judge McFadden sentenced Bauer to 27 months of incarceration.

*United States v. Russell Alford*, 21-cr-263 (TSC) offers the Court a misdemeanor comparator based on similarly situation counts of conviction under 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Alford entered the Capitol, sought to go deeper into the Capitol building, and refused to leave after police ordered him and other rioters to leave. Thereafter, Alford celebrated his participation on social media. After finding that Alford demonstrated a lack of candor and honestly during his trial testimony, the Court sentenced Alford to 12 months of incarceration. But unlike Grillo, Alford did not nearly have the specific

and corrupt intent to interfere with the peaceful transfer of power and the proceedings underlying it. Thus, this is not an appropriate factual comparator and necessitates a stronger punishment.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

32

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[16]

Because Grillo engaged in criminal conduct in tandem with hundreds of other rioters charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Grillo responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million

---

[16] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Grillo to pay $500 in restitution for his convictions on Counts one through five. This amount fairly reflects Grillo's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not convicted of a felony nor directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months of incarceration, two years of supervised release, $500 in restitution, and a mandatory $170 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ Eli Ross*
Eli Ross
Assistant United States Attorney
Illinois Bar Number 6321411
United States Attorney's Office
601 D. Street, N.W.

34

Washington, D.C.   20001
Telephone: (202) 297-1515
Email: Eli.Ross@usdoj.gov