UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PHILIP SEAN GRILLO,<br><br>      **Defendant.** | Crim. Action No. 21-690 (RCL) |

**DEFENSE RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant, Philip Sean Grillo, hereby submits this response to the Government's sentencing memorandum in advance of the sentencing hearing scheduled for December 6, 2024. Mr. Grillo also submits an additional character letter for the Court's consideration. *See* Exhibit A.

  **I. Mr. Grillo is Eligible for a Two-Point Zero-Offender Adjustment**

The PSR correctly includes a two-level, zero-offender adjustment under USSG § 4C1.1. *See* PSR ¶ 49. The government argues that Mr. Grillo is ineligible for the reduction under two specious theories: 1) aiding and abetting violence by others; and 2) issuing indirect threats against officers. Both arguments should be rejected.

USSG § 4C1.1 requires an "inherently individualized analysis." *United States v. Yang*, No. CR 23-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024). To qualify for a reduction under § 4C1.1, a defendant must "not use violence or credible threats of violence in connection with the offense." USSG § 4C1.1(a)(3). Disqualification under § 4C1.1(a)(3) is not based on the "broader 'result' of an offense" but is "framed specifically in terms of actions taken by a

1

defendant himself." *Id*. Accordingly, "[t]he inquiry turns on the actions of the defendant himself or herself, not the actions of others." *Id.*

An individual "use[s] violence" within the meaning of § 4C1.1(a)(1) when he uses physical force with the intent or effect of injuring or abusing another. U*nited States v. Alexander Secor*, No. CR 21-157 (TNM), at *3 (quoting *United States v. Bauer,* 714 F. Supp. 3d 1, 5 (D.D.C. 2024)). An individual makes a credible threat of violence under § 4C1.1(a)(1) when he "believabl[y] express[es] an intention to use physical force to inflict harm." *Id.* at 3-4 (quoting *Bauer*, 714 F. Supp. 3d at 6).

As an initial matter, the government cites incorrect facts to support these theories. The government concedes that Mr. Grillo "did not directly assault or engage in direct violence with law enforcement" but erroneously claims that "he and other rioters pushed past officers guarding the Rotunda Doors from the inside and opened the Rotunda Doors to the mob outside." Gov't Sentencing Memo, ECF No. 136, p. 15.

However, Mr. Grillo did not push officers. Members of the crowd gathered behind Mr. Grillo when he was in the East Foyer. Mr. Grillo testified that the crowd pushed against him and the police officers in front of him, which caused the East Rotunda Doors to open. Trial Tx, p. 816:25 - 817:8. The government offered no testimony contradicting this account, which is depicted on video admitted at trial as Defense Exhibit 4. Accordingly, the PSR correctly states that "[a] crowd from behind the defendant, pushed against him and the police, which caused the East Doors to open, allowing the mob of rioters to enter the East Foyer at 2:38 pm." PSR ¶ 23.

Mr. Grillo's actions were not violent, which the government concedes. Other courts have flatly rejected the government's proposed "violence-by-presence" aiding and abetting theory when analyzing eligibility under USSG § 4C1.1. *See United States v. Yang*, No. CR 23-100

2

(JDB), 2024 WL 519962, at *5 (D.D.C. Feb. 9, 2024) (compiling cases). This Court should similarly reject the theory.

The government also cites the factually inapposite *United States v. Alexander Secor,* No. CR 21-157 (TNM), to argue that Mr. Grillo issued indirect threats against officers for his presence in the East Foyer. However, Mr. Secor admitted that he helped a group of rioters push open the East Rotunda Doors. *See* Statement of Offense, ECF No. 43, p. 5. He admitted to "bracing his body against the backs of other rioters as they pushed," which "trapped the three Capitol Police officers against the doors" and "ultimately overpowered" them. *Id.* Mr. Secor and his attorney signed a statement of the offense acknowledging this conduct. *Id.* at 8. The court found Mr. Secor's conduct – "bracing his body against the backs of the other rioters as they pushed" – to be an "implied" "declaration . . . of an intent to inflict loss or pain" that made him ineligible for the zero-point offender reduction. *Id.* at 4.

Unlike Mr. Secor, Mr. Grillo did not willfully brace his body against other people to push officers. He did not issue actual or implied threats, nor did he use violence. This Court should find Mr. Grillo eligible for the two-point, zero-offender reduction.

## II.   An Upward Departure/Variance is Unwarranted

The government argues for an upward departure or variance by improperly invoking the collective disruption caused by all January 6 participants. The government also cites distinguishable cases where increased punishments were imposed on defendants that were not similarly situated to Mr. Grillo.

The government advances two contradictory bases for an upward departure: 1) U.S.S.G. § 5K2.0(a)(2), circumstances that have "not been identified in the guidelines but that nevertheless [are] relevant to determine the appropriate sentence;" and 2) U.S.S.G. § 5K2.7, the

disruption of a governmental function[1] by the defendant's conduct—a circumstance specifically identified in the guidelines. Gov't Sentencing Memo, ECF No. 136, p. 19.

Like U.S.S.G. § 4C1.1, the plain text of U.S.S.G. § 5K2.7 "is framed specifically in terms of actions taken by a defendant himself." *See Yang*, 2024 WL 519962, at *4. The text requires that "*the defendant's conduct* resulted in a significant disruption of a governmental function." U.S.S.G. § 5K2.7 (emphasis added). Thus, the focus is not on a broader result, but the result of the defendant's specific conduct. The court in *Yang* recognized the "truth to the government's general point" about the cumulative, "manifold harms of that day" but nonetheless held that it cannot "disregard the inherently individualized analysis" contemplated by the relevant guidelines provision. *Yang*, 2024 WL 519962, at *4.

The government's request for an upward departure improperly hinges on the broader result caused by all January 6 defendants. Under a plain reading of U.S.S.G. § 5K2.7, an upward departure should not be based on violence, property damage, threats, weapon possession, or the mayhem caused by other defendants. Sentencing courts have recognized that "other judges in this district have noted that each individual rioter contributed to the disruption of congressional proceedings on January 6 . . . But it does not follow that individuals who trespassed and impeded the certification of the Electoral College vote are also responsible for the conduct of the most violent and egregious rioters." *United States v. Bauer*, Crim. A. No. 21-3862-2 (TNM), ECF No. 195, p. 8. This Court should only consider the actions of Mr. Grillo—a mentally ill, intoxicated defendant who did not possess weapons, make threats, damage property, or use violence.

---

[1] The government defines "the peaceful transfer of power" as "an essential government function." Gov't Sentencing Memo, ECF No. 136, p. 18.

The government cited a litany of cases where judges imposed "significant upward departures and/or variances" but provided no details of those cases. Gov't Sentencing Memo, ECF No. 136, pp. 20-24. A close examination reveals that Mr. Grillo is not similarly situated to those defendants:

**United States v. Hale-Cusanelli, 21-cr-37 (TNM)**

Mr. Hale-Cusanelli was a former United States Army Reservist who maintained a "Secret" security clearance as a security contractor at Naval Weapons Station Earle. Gov't Sentencing Memo, ECF No. 110, p. 11. Outside the Capitol, he recorded a video of himself verbally berating officers, screaming at one of them, "Fuck you! The revolution will be televised, cunt!" *Id.* After entering, he waved other protestors into the Capitol. *Id.* at 14. When an officer attempted to arrest another protester, Mr. Hale-Cusanelli tried pulling the protestor away. *Id.* at 16. After January 6, Mr. Hale-Cusanelli told a confidential source that he "really fucking wish[ed] there'd be a civil war," expressed antisemitic beliefs and conspiracy theories, and stated that there should be a revolution "every few generations." *Id.* at 18.

The government requested a 78-month sentence. *Id.* at 24. The court found a guideline range of 21-27 months. Sentencing Tx, ECF No. 120, p. 55. When sentencing Mr. Hale-Cusanelli, the court noted his conduct on January 6 along with his "degrading statements . . . about women, Jews, and minorities," "infamously pos[ing] as Hitler, and statement that "babies born with any deformities or disabilities should be shot in the forehead." *Id.* at 80-81. The court found his "animus toward racial and religious minorities" an aggravating factor going to dangerousness and "at least in part responsible for [his] desire to obstruct the certification process." *Id.* at 81. The court imposed a 48-month sentence. *Id.* at 87.

***United States v. Secor*, 21-CR-157 (TNM)**

As discussed above, Mr. Secor willfully "brac[ed] his body against the backs of the other rioters as they pushed" against officers in front of the East Rotunda doors. Before January 6, Mr. Secor sent text messages and posted on social media with incendiary content glorifying anticipated violence on January 6. Gov't Sentencing Memo, ECF No. 49, pp.7-8. While in the Capitol, he entered, among other places, Speaker Nancy Pelosi's office suite, the Senate Gallery, and the Senate Floor. Gov't Sentencing Memo, ECF No. 49, p. 2. Mr. Secor walked onto the Senate floor and "mounted the Senate Dais and sat in the seat that had been occupied by Vice President Mike Pence approximately 30 minutes earlier." *Id.*

Mr. Secor's history and characteristics included "his affiliation with extreme political ideologies, ready access to weapons, and tools to potentially build firearms." *Id.* at 33. When executing warrants, agents recovered three knives and a baton in his car, mace and body armor in his bedroom, and a privately manufactured ghost gun in a safe in his home. *Id.* at 35. Recovered video showed Mr. Secor with an AR-style rifle and a tactical helmet. *Id.* Agents found an associate's messages from January 2021, inquiring if Mr. Secor made and sold "any Glocks or AR." *Id.* at 36. Agents also found evidence that Mr. Secor accessed digital instruction manuals for 3-D printing firearms components. *Id.*

Mr. Secor was charged with multiple felonies, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), and Assaulting Officers, in violation of 18 U.S.C. § 111(a)(1). *Id.* at 19. He pleaded guilty to Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2). The government requested a 57-month sentence. *Id.* at 3. The court found a guideline range of 12-18 months. Sentencing Tx, ECF No. 56, p. 20.

The court sentenced Mr. Secor to 42 months, an upward variance accounting for his role, specifically "entry into the Speaker's suite, [] assistance in pushing open doors being guarded by police officers, and [] flagrant conduct on the Senate Floor." *Id.* at 53.

***United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM**

Kevin Seefried and his son and codefendant, Hunter Seefried, were two of the first people to set foot in the Capitol on January 6. Gov't Sentencing Memo, ECF No. 135, p. 6. Before entering, Hunter Seefried cleared broken glass from a window next to the Senate Wing Door to allow entry into the building. Gov't Sentencing Memo, ECF No. 115, pp. 8-9. After entering, Kevin Seefried rushed down a hallway yelling "Where they meeting at?" and "Where are they counting the fucking votes?" ECF No. 135, at 7. When confronted by an officer and instructed to leave, Kevin Seefried jabbed the officer with the base of a flagpole. *Id.* at 9. He demanded to know the location of members of Congress and told the officer "You can shoot me but we're coming in." *Id.*

Kevin and Hunter Seefried were convicted of 18 U.S.C. § 1512(c)(2) and the four standard misdemeanors. ECF No. 135, p. 16. The government requested a 70-month sentence for Kevin Seefried and a 64-month sentence for Hunter Seefried. *Id.* at 19, 26, 28, 32. The court sentenced Hunter Seefried to 24 months and Kevin Seefried to 36 months.

Notably, Kevin Seefried was granted release pending appeal after the United States Supreme Court issued a writ of certiori, agreeing to hear *Fischer*. ECF No. 168. In the order, the court projected that if Kevin Seefried succeeded on appeal, he would be left with only misdemeanor convictions, and a "one-year sentence is likely adequate" to achieve total punishment. *Id.* at 10.

*United States v. William Watson*, **21-CR-513-RBW**

William Watson travelled to Washington, D.C. on January 6 in violation of a court order that he remain in his home state while on bond for drug trafficking charges. Gov't Sentencing Memo, ECF No. 56, p. 1. Before January 6, Mr. Watson proclaimed that he would be "going to DC and killing Joe Biden. *Id.* at 3. He helped destroy a window at the Senate Wing Door and was one of the first to enter the Capitol. *Id.* at 2. He brought a stun gun and a knife with him into the building. *Id*. He used his knife to cut through scaffolding so that protestors could more easily access the Capitol. *Id.* at 2. He also obtained a cannister of OC spray, which he used to threaten officers. *Id.*

Mr. Watson was convicted of violations of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1752 (a)(1) and (b)(1)(A), entering and remaining in a restricted building with a deadly or dangerous weapon.

The government requested a 46-month sentence. *Id.* at 17 & 31. The court found a guideline range of 10-16 months. Sentencing Tx, ECF No. 62, pp. 25-26. The court imposed a 36-month sentence, citing as aggravating factors Mr. Watson cutting the scaffolding, breaking out a window, and making statements voicing his desire to kill President Biden. *Id.* at 86.

*United States v. Riley Williams*, **21-CR-618-ABJ**

Before January 6, Riley Williams revered a far-right white nationalist leader and became "obsessed" with the idea that the election was stolen. Gov't Sentencing Memo, ECF No. 139, p. 3. She expressed a desire to kill Speaker Nancy Pelosi. *Id.* at 4. Ms. Williams entered the Capitol at 2:15 p.m., when members of Congress were still in session in the House and Senate chambers. *Id.* at 6. She directed rioters through the Capitol. *Id.* at 9. While in Speaker Pelosi's office, she directed a rioter to steal Speaker Pelosi's laptop, and Ms. Williams later admitted to stealing a

hard drive and gavel. *Id.* at 11-12. When officers eventually asked her to leave, Ms. Williams verbally berated them and successfully commanded other rioters to push a line of officers. *Id.* at 14-16. After the incident, she narrated and glorified her illegal conduct online. *Id.* at 18. She bragged about gathering rioters with tactical gear and pushing them into police. *Id.*

Ms. Williams was convicted of 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1), and the four standard misdemeanors. *Id.* at 21. The government requested an 87-month sentence. *Id.* at 27, 39. The court found a guidelines range of 41-51 months and sentenced Ms. Williams to 36 months. Sentencing Tx, ECF No. 150, p. 24, 78.

***United States v. Hatchet Speed*, 22-CR-244-TNM**

Hatchet Speed was a member of the Proud Boys and compared the group to the "pro-Nazi paramilitary forces that Hitler used when rising to power." Gov't Sentencing Memo, ECF No. 66, p. 4. He glorified Adolf Hitler. *Id.* at 6. Before January 6, he participated in other violent "stop the steal" rallies. *Id.* at 4. He wore a tactical backpack and reinforced hat while in the Capitol building. *Id.* at 6. In the months after January 6, he bought 12 firearms and spent more than $40,000 at stores that sold firearms, firearm accessories, and ammunition. *Id.* at 12. He faced charges in a separate federal case for his purchase of unregistered silencers. *Id.* at 12-13. He expressed antisemitic motivation for his actions on January 6, and praised domestic terrorists like Eric Rudolph and Ted Kaczynski. *Id.* at 13-16. He was convicted of 18 U.S.C. §§ 1512(c)(2) and the four standard misdemeanors. *Id.* at 18.

The government recommended a 48-month sentence. *Id.* at 36. The court found a guideline range of 18-24 months and imposed a 48-month sentence. Sentencing Tx., ECF No. 67, p. 12, 43.

### III. The Post-*Fischer* Cases Cited By The Government Are Factually Inapposite

Like the above-mentioned cases, the government cited various other factually distinguishable cases to argue for an upward departure even after the dismissal of a felony Obstruction count pursuant to *Fischer*.

First, the government mistakenly cited *United States v. Eicher* when writing that courts "have upwardly departed in January 6 cases . . . in a post-*Fischer* world." ECF No. 136, p. 20-21. Ms. Eicher was convicted of the four standard misdemeanors after a jury trial. *United States v. Eicher*, 22-cr-38 (BAH). Outside the Capitol, Ms. Eicher physically assisted other rioters attempting to ascend onto the Lower West Terrace. *Eicher*, Gov't Sentencing Memo, ECF No. 93, p. 7. She entered the building through a broken window next to the Senate Wing Door. *Id.* at 8. After the incident, she described it as "the best experience ever!" and regretted that she was unable to see the "Senate hall." *Id.* at 10. The government requested a 9-month sentence. *Id.* at 13-14. The court found a guideline range of 6-12 months and sentenced Ms. Eicher to 60 days in custody. Sentencing Tx., ECF No. 103, p. 50, 82.

The government also cited *United States v. Black* but did not mention Mr. Black's egregious conduct. Mr. Black came in physical contact with a line of officers outside the Capitol. *United States v. Black*, 21-CR-127-ABJ, Gov't Sentencing Memo, ECF No. 89, p. 5. He was struck by less-than-legal munitions, causing a gaping wound in his cheek. *Id.* He joined a group of rioters in a heave-ho maneuver designed to breach the East Rotunda doors. *Id.* at 7. After entering the Capitol, Mr. Black entered the Senate chamber. *Id.* at 9. He stepped onto the Senate Floor and tried to access a laptop on a desk. *Id.* at 10. He seized and photographed a document on a desk assigned to Senator Ted Cruz. *Id.* at 10. He posed for photos on the Senate Dais. *Id.* at

10

11. He only left the Senate Chamber after being forced out by MPD officers. *Id.* at 12. He admitted to wearing a knife on his hip while in the Capitol. *Id.* at 15.

Mr. Black was convicted of three felonies relating to his possession of a deadly weapon in the Capitol and two misdemeanors. *Id.* at 18. The government requested a 60-month sentence. *Id.* at 28. The court found a guideline range of 12-18 months and sentenced Mr. Black to 20 months. Sentencing Tx., ECF No. 98, p. 27, 80.

The government was also silent as to the facts of *United States v. Sparks*, 21-CR-87-TJK. Before January 6, Mr. Sparks posted online conspiracy theories about election fraud and suggested that people "c[o]me to arms." Gov't Sentencing Memo, ECF No. 139, p. 3. He posted a photo of Nancy Pelosi and Chuck Schumer with the caption, "How about we the people drag you out by your face." *Id.* at 4. He purchased a .22-caliber rifle the same day he advocated online for a civil war. *Id.* at 5. Sparks wore a bullet proof vest into the Capitol. *Id.* at 7. He was one of the first rioters to breach the Upper West Terrace and motioned for other rioters to join him. *Id.* at 9-10. Sparks was the first rioter to enter the Capitol—he jumped through the window next to the Senate Wing Door immediately after it was broken by Proud Boy Dominic Pezzola. *Id.* at 11-12. Sparks and other rioters chased an officer to the entrance of the Senate Chamber. *Id.* at 14. Sparks aggressively pointed and shouted at officers commanding him to leave. *Id.* at 15-16. After January 6, he continued advocating online for violence. *Id.* at 17. He took steps to delete digital evidence before his arrest. *Id.*

Mr. Sparks was convicted of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 231(a)(3), and the four standard misdemeanors. *Id.* at 21. The 1512 count was dismissed post-*Fischer*. *Id.* The government recommended a 57-month sentence. *Id.* at 46. The court found a guideline range of 15-21 months but imposed an upward departure to "reflect Mr. Sparks' specific role" in the

incident. Sentencing Tx., ECF No. 142, p. 95. The court sentenced him to 53 months, noting that he was the first rioter to enter the Capitol that day, reached an area of the building where members of the Senate and the Vice President were present before their evacuation, and engaged in an aggressive standoff with officers. *Id.* at 95-97.

Like *Black* and *Sparks*, the government offered no facts pertaining to *United States v. Robertson*, 21-CR-34-CRC. Mr. Robertson was a sworn police sergeant with the Rocky Mount, Virginia, Police Department. Gov't Sentencing Memo, ECF No. 124, p. 4. Before January 6, he advocated on social media to violently overturn the election. *Id.* He recruited a subordinate police officer to accompany him to D.C. on January 6. Mr. Robertson went to the Capitol with a gas mask, military food rations, water, and a large wooden stick. *Id.* He had police training on how to use the stick as a weapon. *Id.* Outside the Capitol, he raised the stick in "port arms," a tactical position, and struck two officers. *Id.* at 5-6. He entered the Capitol with the first wave of rioters. *Id.* at 7. After the incident, he destroyed his cell phone upon learning that the FBI had a warrant for his arrest. *Id.* at 9. While on bond, he violated his release conditions by possessing a loaded rifle and a partially assembled pipe bomb, and by purchasing 34 firearms online. *Id.* at 10-11. Mr. Robertson also lied to his employer and the court about being an Army Ranger. *Id.* at 11-12.

Mr. Robertson was convicted of five felonies – 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (entering a restricted building with a dangerous weapon), 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (disorderly conduct in a restricted building with a dangerous weapon), 18 U.S.C. § 1512(c)(1) (obstruction of justice through destruction of evidence) – and a misdemeanor, 40 U.S.C. § 5104(e)(2)(D). *Id.* at 12-13. The government requested a 96-month sentence. *Id.* at 33. At his initial sentencing, the court found a guideline

range of 87-108 months and imposed an 87-month sentence. Sentencing Tx. ECF No. 149, pp. 27, 67. After *Fischer*, the court found a guideline range of 37-46 months and imposed a 72-month sentence. Resentencing Tx., ECF No. 176, p. 46, 64. The court found that Mr. Robertson's conduct – including "planning, bringing gas masks, MREs, dangerous weapons to the scene, [] purpose in coming, which was explicitly to be part of a counterinsurgency" and his accumulation of weapons after his arrest – put the case "outside the heartland" of typical civil disorder or obstruction cases. *Id.* at 61-62.

## IV. The Government's "Suitable Comparisons" Are Also Dissimilar

The government offers three cases that purportedly "provide suitable comparisons to the relevant sentencing considerations in this case." However, a close examination of those cases reveals notable differences.

The government first cited *United States v. Anthony Williams*, 21-cr-377 (BAH). Unlike Mr. Grillo, Anthony Williams was a career criminal who sustained 13 prior criminal convictions, including for arson and burglary, and 20 other criminal arrests or police contacts. Sentencing Tx, ECF No. 149, p. 22. Before January 6, Mr. Williams posted on social media "that he . . . was going to do anything possible to stop the certification of Joe Biden as the President, and proposed violence towards those who had engaged in fraud or treason." Gov't Sentencing Memo, ECF No. 120, p. 7. Outside the Capitol, he helped protestors climb bike racks to access the Northwest stairs. *Id.* at 11. Mr. Williams stole water bottles that officers stored on Capitol grounds to be used for decontamination from chemical irritants. Gov't Sentencing Memo, ECF No. 120, p. 2. After the incident, he bragged about the events at the Capitol on social media, calling it "the proudest day" of his life. *Id.* at 23. Mr. Williams was convicted of 18 U.S.C. § 1512(c)(2) and the four standard misdemeanors.

The government requested a 64-month sentence. ECF No. 120 at 2-3. The court found a guidelines range of 57-71 months and imposed a 60-month sentence. *Id.* at 50, 93.

Notably, after the Supreme Court issued a writ of certiori in *Fischer*, Mr. Williams was granted release pending appeal. The court rejected the government's suggestion that Mr. Williams could serve consecutive sentences on the remaining misdemeanor counts for a term greater than 12 months. Memorandum Order, ECF No. 153, p. 9.

Next, the government cited *United States v. Pauline Bauer*, 21-cr-386 (TNM). While inside the Capitol, Ms. Bauer screamed at officers "We want Nancy Pelosi, that's who we want," "Bring them out, you bring them our or we're coming in," "They're criminals. They need to hang," and "Bring Nancy Pelosi out here now. We want to hang that fucking bitch. Bring her out." Gov't Sentencing Memo, ECF No. 180, pp.10-11. She shoved an officer and screamed "Fuck you, you son of a bitch, you back up." *Id.* at 11. Perplexingly, Bauer was not charged with assaulting an officer. She was ineligible for a zero-point offender reduction because she used violence and made credible threats of violence when she incited the crowd to "hang" Speaker Pelosi. Memorandum Order, ECF No. 195, p. 4. The sentencing court also noted Ms. Bauer's behavior in court. She refused to comply with pretrial release conditions, and when the court ordered her detention, she had to be "literally dragged screaming out of the courtroom." *Id.* at 9. The government requested a 78-month sentence. The court imposed 27 months.

Finally, the government cited *United States v. Russell Alford*, 21-cr-263 (TSC). Days after the 2020 election, Mr. Alford alluded to violence when he shared a graphic captioned "By Bullet or Ballot Restoration Of The Republic Is Coming." Gov't Sentencing Memo, ECF No. 108, p. 4. He posted other troubling messages on social media, including a theory that "The

14

Constitution Actually says you can legally Overthrow your Government if they Are Tyrannical." *Id.* at 5.

Mr. Alford entered the Capitol through a broken door and was present near the location where Ashli Babbitt was shot and killed. *Id.* at 7-10. After January 6, he made social media posts glorifying the violence at the Capitol and mocking law enforcement. *Id.* at 10. It is unclear why the government did not charge Mr. Alford with a violation of 18 U.S.C. § 1512(c)(2). He was only charged with the four standard misdemeanors.

Mr. Alford proceeded to trial but – unlike Mr. Grillo – he did not do so to preserve a legal challenge to a felony obstruction count. At trial, he testified and – unlike Mr. Grillo – denied responsibility for the charged misdemeanors. The court sentenced Mr. Alford to 12 months, dismissing the government's request for consecutive sentences.

V.    **The Government's Request For Consecutive Terms Is Unreasonable**

Consecutive sentences are generally inappropriate where the offenses involve overlapping relevant conduct. *Cf. United States v. Heard*, 359 F.3d 544, 549–51 (D.C. Cir. 2004). Consecutive sentences would likely be "greater than necessary[] to comply with the purposes" of sentencing and would thus be inappropriate. 18 U.S.C. §§ 3553(a), 3584(b).

In *United States v. Herrera*, the court rejected the government's consecutive term argument and affirmed that concurrent sentences are the "default practice under federal law." *United States v. Herrera*, No. CR 21-619, 2024 WL 1655204, at *6 (D.D.C. Apr. 17, 2024) (ordering bond pending appeal after finding 13 months imprisonment may exceed length of sentence, absent section 1512(c)(2) conviction). A similar argument was rejected in *United States v. Adams*, No. 21-CR-354 (APM), 2024 WL 111802, at *3 (D.D.C. Jan. 10, 2024). There, the court granted release pending appeal in light of *Fischer*. *Id.* The court found that if the

defendant was resentenced "he would be a misdemeanant, not a felon" and acknowledged the standard imposition of "sentences of short terms of incarceration (90 days or less) or probation with home confinement for January 6 defendants convicted only of a misdemeanor." *Id.*

The Court should consider this case similarly. Mr. Grillo is a misdemeanant with no criminal record who struggled with mental health issues and intoxication on January 6. He committed no acts of violence, theft, vandalism, and made no threats.

We ask the Court to respectfully consider a sentence of home detention and probation.

                                                  Respectfully submitted,

                                                  _____/s/_____
                                                  Charles V. Millioen
                                                  Michael Padden
                                                  Attorneys for Philip Sean Grillo
                                                  Federal Defenders of New York, Inc.
                                                  One Pierrepont Plaza, 16th Floor
                                                  Brooklyn, NY 11201

**Certificate of Service**

I certify that a copy of the forgoing was filed electronically for the Court and emailed to opposing counsel on

December 4, 2024.

/s/ *Charles V. Millioen*
Charles V. Millioen
Assistant Federal Defender
Attorney for Mr. Philip Sean Grillo