UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**PHILIP SEAN GRILLO**,<br><br>    *Defendant*. | Case No. 1:21-cr-690-RCL |

## NOTES FOR SENTENCING

To say that this sentencing is taking place in an unusual historical context is, perhaps, an understatement.  The Capitol Riots took place nearly four years ago.  For many Americans, the events of that day are a distant, hazy memory.  For many others, though, January 6, 2021 is a day they will never forget, no matter how much they would like to.  Among others, I am speaking of the brave officers of the Metropolitan Police Department and Capitol Police who selflessly put their own safety on the line to protect the physical edifice of our republic and the elected representatives who are its lifeblood.  I heard many of their harrowing stories at Mr. Grillo's trial and several others, as have countless jurors—everyday Americans who have been summoned to this courthouse to perform one of the most solemn and difficult civic duties that our Constitution prescribes.  These people know what happened at the Capitol on January 6, 2021.  They know how perilously close we came to letting the peaceful transfer of power, that great cornerstone of the American republican experiment and perhaps our foremost contribution to posterity, slip away from us.

Next month, the peaceful transfer of power will be on display as a new administration takes control of the White House.  Everybody in this room, including Mr. Grillo, is aware that the President-Elect has publicly contemplated pardoning people who participated in the Capitol Riots

1

at various points throughout his campaign. This Court has nothing to say about that decision. When President Reagan appointed me to the bench 37 years ago, I swore an oath to perform the duties incumbent on me according to the Constitution of the United States and have lived every day since then according to that oath. That Constitution, in Article II, Section 2, assigns the "Power to grant Reprieves and Pardons for Offences against the United States" to the President alone. Many years ago, our Supreme Court wrote: "It is the intention of the Constitution that each of the great co-ordinate departments of the government—the Legislative, the Executive, and the Judicial—shall be, in its sphere, independent of the others. To the executive alone is entrusted the power of pardon; and it is granted without limit." *United States v. Klein*, 80 U.S. 128, 147 (1871). In other words, the President alone bears the power of the pardon and the responsibility that comes with it.

But just as the Constitution vests some powers exclusively in the President, so too have the Constitution and Congress assigned certain duties to the federal courts. Article III, Section I vests the courts with the "judicial Power of the United States." In the exercise of that power, the courts facilitate the search for truth in the matters before them, interpret the laws, and impartially dispense justice according to those laws. Just as the President must make decisions on matters of clemency without interference from the coordinate branches, so too must our judiciary independently administer the laws and sentence convicted offenders. That is the duty which calls us here today.

Nonetheless, this Court has heard, from Mr. Grillo and others, various arguments to delay criminal proceedings related to the Capitol Riots until after the inauguration, or to show leniency to those whom it sentences. Some, including Mr. Grillo, have argued that this Court should wait until the President-Elect announces his pardon policy, in the interest of conserving resources and sparing defendants the burden of convictions or sentences that may later be lifted. *See* Mot. to

Continue Sentencing 3–4, ECF No. 142. Others, again including Mr. Grillo, have sought to minimize the events of January 6 or their role in them. They have claimed that the Capitol Riots were a peaceful protest or, at worst, a mere trespass, implying or saying outright that the rioters are "political prisoner[s]" being punished for protected First Amendment activity. *See* Mot. to Continue Sentencing 3; *see also* Mot. for Acquittal 3–4, ECF No. 130 (emphasizing Mr. Grillo's speech on January 6, such as singing the Star-Spangled Banner and saying "stop the steal"). Others still have lamented that the justice system has targeted them for vigorous prosecution while letting participants in other politically charged events go free. This sentencing presents an ideal opportunity to clear the air, remind ourselves what really happened on January 6, 2021, and explain once and for all why the Court must do its job even in difficult and politically fraught cases such as this.

On January 6, 2021, an angry mob of rioters invaded and occupied the United States Capitol, intending to interrupt the certification of the 2020 presidential election results and thwart the peaceful transfer of power that is the centerpiece of our Constitution and the cornerstone of our republican legacy. To get into the Capitol, the rioters had to bypass a number of obstacles that unambiguously signaled to each of them that what they were doing was against the law. They ignored signs, barricades, and police presence indicating that they were in a restricted area. They flouted direct orders by United States Capitol Police and Metropolitan Police to turn back and disperse. In some cases, they engaged in pitched combat with the officers defending the Capitol, striking them with fists, poles, crutches, stolen batons and riot shields, and hurling objects of all sorts at them. When the police tried to erect barricades, the mob pushed against them and toppled them, stampeding through and over the officers. An officer who testified at Mr. Grillo's trial said that at one point, as he was trying to hold a door shut to prevent the mob from entering through it,

he felt like he was being "crushed," and that "he could literally feel the breath coming out of [him] as [he] was being pinned." *See* Trial Tr. 539, ECF No. 123.  The rioters broke down doors and smashed windows, and clambered into the Capitol over shattered glass, through clouds of tear gas and smoke from smoke grenades, and amid the unmistakable blare of alarms.

Once inside, they did all manner of things.  Some milled about rather aimlessly, taking in the sights, and congratulating one another.  Others entered the offices of our elected representatives, destroying and pilfering as they went.  Some entered onto the Senate floor, the very site where the election was about to be certified before their incursion, where they gave speeches extolling their violent insurgency and celebrating their fleeting efforts to derail the onward march of American democracy.

We know all of this because my colleagues and I have presided over hundreds of trials, read hundreds of guilty pleas, heard from hundreds of law enforcement witnesses who were there, and viewed thousands of hours of video footage attesting to the bedlam.  We also know all of this because many of the rioters themselves gave interviews or posted on social media before, during, and after the riot.  Their own statements reveal their heterogenous motives.  Some claim to have gotten swept up in the fervor of the day, with only a vague notion of what they were doing and why.  But others came bearing far more sinister beliefs and intentions.  They told the world that the election was stolen, a claim for which no evidence has ever emerged.  They told the world that they were there to put a stop to the transfer of power, even if that meant ransacking, emptying, and desecrating our country's most hallowed sites.  Most disturbingly, they told the world that particular elected officials who were present at the Capitol that day had to be removed, hurt, or even killed.  Fortunately, the Vice President and the members of Congress were evacuated in time to avoid a confrontation with the mob.  But tragically, dozens of people, officers and rioters alike,

were injured. A handful of rioters died in the course of the day's events, and five police officers died soon afterward: one from a series of strokes that have been partly attributed to the riot, and four by suicide. *See* Chris Cameron, *These Are the People Who Died in Connection with the Capitol Riot*, New York Times (Jan. 5, 2022), https://www.nytimes.com/2022/01/05/us/politics/jan-6-capitol-deaths.html. One can only wonder what further horrors might have transpired if our elected officials had not gotten out in time. No matter what ultimately becomes of the Capital Riots cases already concluded and still pending, the true story of what happened on January 6, 2021 will never change.

Moreover, the Riots took a toll that was not confined to that one day or to the victims who were there. The Court must take into account the full cost of the Riots, which rippled throughout society and continues to reverberate and accrue even today. Last year, the Government Accountability Office estimated that the riots cost a staggering $2.7 billion, including the costs of repairing the Capitol building and grounds, as well as expenses arising from both the immediate law enforcement response and the ensuing investigations undertaken by the District of Columbia and federal agencies. *See* Government Accountability Office, *Federal Agencies Identified Some Threats, but Did Not Fully Process and Share Information Prior to January 6, 2021* (Feb. 28, 2023), https://www.gao.gov/assets/d23106625.pdf. The American taxpayer has been forced to bear all these costs, not to mention the countless jurors who have collectively spent untold thousands of hours away from their jobs and families to participate in more than one hundred trials, virtually all of which ended in guilty verdicts. Let me be clear: trial by jury is among the most sacrosanct rights guaranteed by our Constitution. But that does not mean that every case should, practically speaking, go to trial, especially if the evidence of guilt is overwhelmingly strong, as in most of the Capitol Riot trials. It is gravely disappointing that so many jurors had to be wrenched

away from their daily lives to hear from rioters who would rather spout off mostly bogus defenses than take accountability for their actions. Mr. Grillo decided to put the Government to its proof at trial, where his excuses disintegrated immediately upon contact with the facts. To hear him now argue for a lighter sentence based on acceptance of responsibility is an abject farce.

Our system of justice punishes individuals, not collectives. At trial, the Government bears the burden of proving each element of each charged offense for every individual defendant beyond a reasonable doubt. Similarly, at sentencing, the Court prescribes a sentence based on the conduct and characteristics of the individual defendant. That is what the Court will do today, as it has done for each defendant in every criminal case ever before it. The Capitol Riots defendants are no exception.

But in carrying out this duty, this Court need not, and indeed should not, turn a blind eye to the gravity of that day's events in their totality. Mob mentality is a powerful force. There can be no monsoon without billions of individual water drops. Likewise, the Capitol Riots never would have happened if not for a critical mass of people who each chose to contribute their individual presence to the crowd. An individual defendant may claim that he did not *personally* disrupt the certification of the electoral vote, that she did not *personally* cause our elected officials to flee their posts. But each participant emboldened the next, even if only tacitly, simply by joining the mob. The duty to deliver a just, individualized sentence does not compel this Court to shirk from this reality; in fact, justice *demands* cognizance of it.

Mr. Grillo's conduct on January 6, 2021 exemplifies why even non-violent rioters merit punishment. He did not directly disrupt the certification of the electoral vote, destroy public property, or attack law enforcement. Nevertheless, he emboldened the mass of individuals storming the Capitol, amplifying the mob mentality that overtook the rioters that day and turned

thousands of people—many of whom had led good, law-abiding lives—into criminals. He repeatedly encouraged his fellow rioters to "charge" as he entered the Capitol, stating in a video that he was "storming" the Capitol "to stop the steal." Although he testified at trial that he "had no idea" the electoral certification process was going to happen on January 6, the record belies his claim. He analogized the violence of January 6 to the "friendly type" of "mosh pit energy" one would find at a rock and roll concert, claiming that he was "just going with the flow." But the rioters were not dancing in a music hall—they were trespassing on restricted federal grounds. And the "flow" that day was not the beat of a musical number, but chants encouraging the rioters to "stop the steal" and "[h]ang" various elected officials.

     Mr. Grillo's trial testimony further underscores the dangerous double-speak that has taken hold of much of the commentary surrounding January 6. Aside from admitting to "trespassing," Mr. Grillo took no responsibility for contributing to the violence that took place on January 6. He stated that he did not jump through a broken window to enter the Capitol but was instead pulled through it. After being shown a video of him jumping through the window unassisted, he backtracked to say that "somebody" pushed his rear. He claimed that once inside the Capitol, he was being pushed around, when the truth is that he added his weight to the mass of people who pushed past Capitol police lines and into the halls of Congress. Most galling of all, he even went so far as to claim that he was there protecting police officers from the mob. To hear Mr. Grillo's version of January 6, he was a passive, wandering bystander who had the bad luck of being swept up in the current of malevolent rioters. But I presided over Mr. Grillo's trial. Mr. Grillo and thousands like him were not forced to trespass on Capitol grounds on January 6. Like the others, he did so voluntarily. And even though Mr. Grillo himself was not violent that day, his mere presence in the mob gave the violent rioters the reassurance they needed that if they beat, maimed, and

assaulted police officers, they would be cheered on as "patriots" and "heroes" by hundreds of like-minded individuals standing right behind them.

Now, I feel it is important to address some of the arguments that the Court has heard swirling in the January 6 cases pending before it, including this one, and in the public discourse. First, this Court and others in this District have heard arguments from Capitol Riots defendants to delay their sentencings, and even their trials, until after the upcoming inauguration. Some, like Mr. Grillo, have claimed that, with the possibility of a pardon looming, proceeding as usual in their cases is a poor use of judicial, prosecutorial, and defense resources. *See* Mot. to Continue Sent'g at 3–4. Others have expressed a concern for wasting jurors' time.

Of course, each judge in this District must use their discretion and judgment to assess the balance of interests in each particular case. But in my view, these arguments are all flawed, for two reasons. First, they ask this Court to put off the performance of its own constitutional duties based on mere speculation about how a different, co-equal branch of government will go about *its* duties. As stated earlier, my role as a judge is to facilitate the search for truth, interpret the law, apply it to the facts, and dispense justice as the law demands in the cases before me. The executive's role is to decide whom to investigate and prosecute, present its case to the court and, when all is said and done, dispense clemency as it sees fit. The fundamental American principle of separation of powers would be empty of meaning if the courts allowed themselves to become paralyzed based on conjecture about the coordinate branches' future actions. I will do my job, as I am bound by oath to do, and the President will do his; it is as simple as that.

Second, and perhaps more directly responsive to the "wasting resources" argument, resource efficiency is an important and legitimate concern, but it is not the Court's North Star. The bedrock assumption of our judicial system is that truth and justice, law and order, are values of

8

paramount importance, and are worth protecting even at great expense. This proceeding and others like it show that our system of justice is always working, no matter the political winds of the day. That is a message worth sending. Sacrificing it in the name of judicial economy would be penny-wise but pound-foolish.

Next, I will address those defendants who seek to minimize the gravity of what transpired on January 6. Some have claimed that the Capitol Rioters were merely engaged in political speech, activity protected by the First Amendment. Mr. Grillo's motion to continue this sentencing even included a quotation in which the rioters were described as "political prisoner[s]." Mot. to Continue Sent'g at 3. This is plainly not right, and rests on a groundless bastardization of the First Amendment. That Amendment protects certain core American liberties: the freedom of conscience, speech, and peaceable assembly, among others. A person cannot be prosecuted for the exercise of these rights. No doubt, many of the rioters were motivated by sincere beliefs which they voiced before, during, and after the riot. Had they chosen to express those beliefs through peaceful speech and assembly, their conduct would have been protected. Instead, they chose to trespass on restricted grounds, destroy public property, assault law enforcement officers, and attempt to subvert the will of an electoral majority. Conduct such as this is lightyears outside the aegis of the First Amendment. Indeed, no civilized society could survive if anybody with strong political convictions were permitted to express those convictions by rioting, looting, and physically attacking their fellow man with impunity. Having read dozens of indictments related to January 6, I can say confidently: nobody has been prosecuted for protected First Amendment activity. Nobody is being held hostage. Nobody has been made a prisoner of conscience. Every rioter is in the situation he or she is in because he or she broke the law, and for no other reason.

I have already addressed the efforts by Mr. Grillo to trivialize the Capitol Riots as an innocuous trespass. But to reiterate, even the non-violent rioters committed something far more serious than "trespass" connotes. They invaded the very nerve center of our republic during the performance of one of its most important functions: certifying the results of the presidential election. Many of them caused serious property damage as they went, and *all* of them took advantage of that damage by streaming through breached doors and broken windows. To hear this onslaught compared to a casual uninvited stroll on restricted grounds is unconscionable.

Finally, the Court will address the complaint, swirling in some places throughout the media and in public discourse on the internet, that the Capitol Rioters have been selectively targeted by law enforcement while other rioters have been spared from prosecution. It is no secret that the last few years have seen elevated levels of protest activity. Many of these protests—including some organized by the Black Lives Matter and pro-Palestine movements—have devolved into riots, marred by intimidation of political adversaries, defacement, destruction and theft of property, and sometimes violence. Some observers have perceived a contrast between the vigorous prosecution of the Capitol Rioters on the one hand, and law enforcement's lenient treatment of these other disturbances—allowing the riots to go on too long and letting the rioters go mostly unpunished— on the other. They argue that the justice system has treated the Capitol Rioters more harshly due to their views, or because cracking down comparably on the other riots would be too controversial. So, I will add a few words about protest, civil disobedience, and prosecutorial discretion.

As someone who marched with Dr. Martin Luther King and stood by the Reflecting Pool in 1963 when he delivered his famous "I Have a Dream" speech, I believe in the power of free speech and protest. If the Capitol Rioters had simply marched from the Ellipse to the Capitol grounds and protested outside the restricted perimeter, their actions would have been lawful.

Moreover, although I do not condone breaking the law, I have said before that "history has shown there is some role for . . . peaceful—let me repeat, *peaceful*—" civil disobedience, where the actor "acknowledges they have broken the law and accepts the legal consequences that follow." *See* Notes for Sentencing 2, *United States v. Johnatakis*, 21-cr-91-RCL-3 (Apr. 3, 2024), ECF No. 272. But let me say emphatically, with respect to the Black Lives Matter protests, the pro-Palestine rallies, the Capitol Riots, and any and all other demonstrations: defacement of property, looting, intimidation, and political violence have no place in our society, no matter the actor or their purpose. In a perfect world, anyone who engages in such behavior would be prosecuted and brought to justice, regardless of their political beliefs or the popularity of their cause.

But we do not live in a perfect world. Prosecutors are agents of the executive branch, who must deploy their limited resources judiciously, according to the best interests and priorities of the public they serve. Though I may express my opinion on how prosecutors exercise their discretion, the courts do not police the exercise of that discretion, except where there is clear evidence that the prosecutors' choices implicate some statutory or constitutional right. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364–65 (1978); *Wayte v. United States*, 470 U.S. 598, 608 (1985). In other words: it is the role of the *prosecutor* to make charging decisions. It is the role of the *Court* to impartially apply the law and dispense justice to whomever appears before it. For those dissatisfied by how the executive wields its prosecutorial discretion, the solution in our democracy lies at the ballot box. But the solution is *not* to ask the courts to serve as a counterweight to the executive by showing undue leniency in the cases before them. This is tantamount to asking the courts to abandon their post as neutral arbiters, which the courts must never do under any circumstances.

As a final word before delivering the sentence, I will address the Government's request that this Court depart or vary upward from the sentence prescribed by the Sentencing Guidelines

and impose consecutive misdemeanor sentences. It argues that such a deviation is warranted because of Mr. Grillo's bad intentions leading up to and on January 6, 2021, his leadership of his fellow rioters, the contempt his actions showed for democracy and the rule of law, his endangerment of the peaceful transfer of power, and his remorseless misrepresentations to the Court and jury. I have sentenced numerous Capitol Rioters, and the Government has often requested an upward deviation from the Sentencing Guidelines in those cases. I do not recall ever granting such a request in a January 6 case, and I will not do so today. The defense likewise requests a downward departure from the Guidelines. I will reject this request as well.

It is true that the Sentencing Guidelines are advisory. *See United States v. Booker*, 543 U.S. 220 (2005). Nevertheless, this Court considers the Guidelines very helpful in the vast run of cases. They provide a valuable synthesis of our society's collective sense of what constitutes a just sentence, and further the important goal of achieving uniformity in sentencing. The Capitol Riots cases are, to be sure, out of the ordinary: the extremely grave nature of the day's events aggravates the severity of the charged conduct. But the Riots are also unusual in another way: many of the defendants have otherwise led mostly law-abiding lives, as in Mr. Grillo's case. The Sentencing Guidelines are designed to facilitate complicated, multi-factorial sentencing decisions, aiding the Court in its evaluation of both the defendant's conduct and history. They therefore provide a useful rubric, even in unique cases such as this. And they provide sentencing *ranges* specifically so that the Court may give effect to case-specific factors, such as those the parties have raised and Mr. Grillo's demonstration of sincere contrition at his sentencing today, by giving a sentence at the high or low end of those ranges and declining a departure. There are surely cases which merit deviation from the Guidelines, but in this case, a sentence at the high end of the Guidelines range is sufficient to achieve a just sentence.

In our constitutional structure, the people enact laws through their elected representatives. When those laws are broken, prosecutors, defense attorneys, and the courts work in tandem to sort the innocent from the guilty. Then the courts dispense justice upon the latter as the law requires. The courts do so without regard to a defendant's political affiliation or any other attribute, and without consideration of whether our decisions will be popular. That is what it means to have an independent judiciary, that is what it means to have law and order, and that is why we are here in this courtroom. A jury of Mr. Grillo's peers found that he broke the law when he participated in the Capitol Riots of January 6, 2021, and it falls to this Court to hold him accountable. So now, bound by my oath of office and my allegiance to the Constitution of the United States, that is what I will do.

Date: December 6, 2024

Royce C. Lamberth
United States District Judge